FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.
2008 JUL -2 AM 8: 35

CLERK R. Ock.
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

BRUCE BERNARD TOWNSEND,

       Plaintiff,

    vs.

JOSE M. VAZQUEZ; HENRY RUIZ;
Lt. FANNUCCI; Mrs. HARRIS;
SCOTT SCHLEDER; Lt. R. MAULDIN;
Chaplain O'NEIL; MICHAEL B.
COOKSEY; CHRISTOPHER
ERLEWINE; SUSAN VAN BALAAN;
ROBERT McFADDEN; JOHN M.
VANYUR; KATHLEEN M. KEENEY;
VAN VANDIVER; PAUL KENNEDY;
RAY HOLT; Mr. SANTIAGO, and
Lt. STERN,

       Defendants.

CIVIL ACTION NO.: CV207-043

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Bruce Townsend ("Plaintiff"), an inmate currently incarcerated at the Federal Satellite Low in Jesup, Georgia ("FSL Jesup"), filed a Complaint pursuant to 28 U.S.C. § 1331 and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), contesting certain conditions of his confinement. Defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. Plaintiff filed a Response. For the reasons which follow, Defendants' Motion should be **GRANTED**, in part, **DISMISSED**, in part, and **DENIED**, in part.

AO 72A
(Rev. 8/82)

## STATEMENT OF THE CASE

Plaintiff contends that officials at FSL Jesup denied him the right to practice his religion, Rastafarianism, by denying him a special diet, an outside tabernacle, ceremonial drums, hair coverings, and the use of sacramental marijuana. Plaintiff asserts that, while other religious groups are able to practice and uphold the tenets of their faith, Rastafarians are denied the equal opportunity to do so. Plaintiff alleges that as a result of having been denied the ability to practice his faith, he has suffered both mental and physical suffering. Plaintiff contends that this action has denied him his rights under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Religious Freedom Restoration Act ("RFRA"), the Equal Protection Clause of the Fourteenth Amendment, the Free Exercise Clause of the First Amendment, the Administrative Procedures Act, and the Privacy Act.[1]

Defendants generally assert Plaintiff's claims against them should be dismissed, or, in the alternative, that they are entitled to judgment as a matter of law. Defendants aver the Administrative Procedures Act ("APA") provides no basis for a suit based on alleged constitutional violations. Defendants also aver the use of marijuana is prohibited within prisons based on Bureau of Prisons' ("BOP") regulations. Defendants allege they have not burdened Plaintiff's exercise of his religion and have accommodated the tenets of his faith within a penological setting and that Plaintiff sets

---

[1] Plaintiff asserts he moves for the dismissal of Defendant Vanyur due to his limited involvement in the actions Plaintiff asserts happened. (Doc. No. 41, ¶ 58). Plaintiff's claims against Defendant Vanyur should be dismissed.

forth no facts which support his allegations of violations of the First and Fourteenth Amendments and the RFRA.

## MOTION TO DISMISS STANDARD OF REVIEW

In considering a motion to dismiss filed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, a court must determine whether a plaintiff's "[f]actual allegations [are] enough to raise the right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007)[2]. In making this determination, a court must construe the complaint in a light most favorable to the plaintiff. Christopher v. Harbury, 536 U.S. 403, 406, 122 S. Ct. 2179, 2182, 153 L. Ed. 2d 413 (2002). When evaluating a motion to dismiss, the issue is not whether a plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." Little v. City of North Miami, 805 F.2d 962, 965 (11th Cir. 1986). The threshold is "'exceedingly low'" for a complaint to survive a motion to dismiss. Ancata v. Prison Health Services, Inc., 769 F.2d 700, 703 (11th Cir. 1985) (quoting Quality Foods de Centro America, S.A. v. America Agribusiness Devel., 711 F.2d 989, 995 (11th Cir. 1983)). A complaint filed by a *pro se* plaintiff is held to even less stringent standards than a complaint drafted by a lawyer. See Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972) (citing Conley, 355 U.S. at 45-46, 78 S. Ct. at 102).

---

[2] In Twombly, the Supreme Court "retired" the "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957), and noted that, while "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff is obliged to "provide the grounds of his entitlement to relief", which requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" 550 U.S. at ___, 127 S. Ct. at 1264-65.

## DISCUSSION AND CITATION TO AUTHORITY

### I.    Improper Service

Defendants asserts Plaintiff's claims against Defendants O'Neill, Van Baalen, Ruiz, Vanyur, Cooksey, Kenney, Harris, Holt, Santiago, Schleder, Maudlin, Stearns, and Erlewine should be dismissed due to insufficiency of process and service of process pursuant to Rules 12(b)(4) and (5) of the Federal Rules of Civil Procedure. Defendants contend there is no evidence that Defendants O'Neill, Van Baalen, Ruiz, Vanyur, Cooksey, Kenney, Harris, Holt, Santiago, Schleder, Maudlin, Stearns, and Erlewine have been served with copies of a summons and the Complaint by mail or any other means. Defendants allege Plaintiff is not proceeding in forma pauperis in this case and was not entitled to have the United States Marshals Service serve any Defendants on his behalf.

Given the Government's Response to the undersigned's Order dated March 10, 2008, this portion of Defendants' Motion should be dismissed as moot.

### II.    Pleading Requirements of Rule 8(a)[3]

Defendants contend Plaintiff's Complaint consists of his six page form complaint and the eight page "claim" appended to his complaint, not the entire 46 pages Plaintiff calls his complaint with 88 pages of exhibits. Defendants assert Plaintiff's "amendment to civil action" should be stricken from the record because it is redundant surplusage, which alleges no facts and which does not explain how the Defendants may be held personally liable to Plaintiff.

---

[3] Defendants captioned this section of their Motion to reference FED. R. CIV. P. 8(a); however, the body of the allegations contained in this section references Rules 7(a) and 8(e). The undersigned has assumed Defendants' counsel intended to cite Rule 8(a), as this is the Rule pertaining to the pleading requirement.

Plaintiff alleges this portion of Defendants' Motion should be denied because the amendment to his Complaint provides support for his arguments and "offer proof and show perjury in several" of the Defendants' affidavits. (Doc. No. 40, p. 2).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" Erickson v. Pardus, ___ U.S. ___, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (quoting Twombly, 550 U.S. at ____, 127 S. Ct. at 1964). "A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Id. (internal punctuation and citations omitted).

In his Complaint, Plaintiff contended that officials at FSL Jesup denied him the right to practice his religion, Rastafarianism, by denying him a special diet, an outside tabernacle, ceremonial drums, hair coverings, and the use of sacramental marijuana. Plaintiff asserted that, while other religious groups are able to practice and uphold the tenets of their faith, Rastafarians have been denied the equal opportunity. Plaintiff alleged that as a result of having been denied the ability to practice his faith, he suffered both mental and physical injuries.

The allegations Plaintiff set forth in his Complaint, as amended, are sufficient to overcome the pleading requirements of Rule 8(a). Defendants cannot claim they do not have sufficient notice of Plaintiff's claims against them, as this contention is belied by the quite voluminous brief Defendants submitted in support of their Motion. Defendants' Motion on this ground should be denied.

## III.    Plaintiff's Claims against the Bureau of Prisons, FCI Jesup, and Defendants in their Official Capacities

Defendants allege Plaintiff's claims against the Bureau of Prisons, FCI Jesup, and Defendants in their official capacities are not cognizable pursuant to Bivens. Defendants also allege the proper defendant in a Bivens action is a federal officer in his or her individual capacity, not the federal agency employing that officer.

Plaintiff avers there is a deficient policy in place which caused his religious rights to be denied. Plaintiff contends Defendants implemented this policy to deny him the right to practice mandatory tenets of his religion because Defendants are religiously indifferent. Plaintiff also contends Defendants have not objected to his use of § 1331, and thus, his claims against them in their official capacities should stand.

"Bivens claims can be brought against federal officers in their individual capacities only; they do not apply to federal officers acting in their official capacities." Thibeaux v. Mukasey, 2008 WL 1891474 at *3 (11th Cir. April 30, 2008) (citing Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70-72, 122 S. Ct. 515, 521-22, 151 L. Ed. 2d 456 (2001)). "[T]he goal of Bivens was to deter *individual federal officers* from committing constitutional violations, and not to deter the conduct of a policymaking entity." Alba v. Montford, 517 F.3d 1249, 1253 (11th Cir. 2008) (internal citation and punctuation omitted) (emphasis in original). Thus, Plaintiff's Bivens claims against the individually-named Defendants in their official capacities and against FCI Jesup should be dismissed.

In addition, to the extent Plaintiff seeks to hold the Federal Bureau of Prisons liable for any alleged constitutional violations pursuant to Bivens, he cannot do so. See

FDIC v. Meyer, 510 U.S. 471, 485-86, 114 S. Ct. 996, 1005-06, 127 L. Ed. 2d 308 (1994) (stating the proper defendants in a Bivens claim are the federal officers who allegedly violated the plaintiff's constitutional rights, not the federal agency which employs the officers). Plaintiff's Bivens claims against the Federal Bureau of Prisons also should be dismissed.

## IV.    Decriminalization of Marijuana Use

Defendants allege that, to the extent Plaintiff seeks the decriminalization of the use of marijuana, his claims should be dismissed for failure to state a claim upon which relief may be granted. Defendants assert Plaintiff cites no basis for the extraordinary relief sought.

Plaintiff contends Defendants and the Bureau of Prisons ("BOP") have agreed to allow Catholics the use of wine and Native Americans the use of tobacco as part of their sacraments. Plaintiff alleges the basis of his claim is that there has been no attempt to provide equal treatment to the Rastafarians.

To the extent Plaintiff seeks to have Defendants decriminalize the use of marijuana by Rastafarians at FCI Jesup, said claims are without merit. The use and possession of marijuana is controlled by the Controlled Substances Act of 1970, 21 U.S.C. § 812, et seq., which was passed into law by Congress. Employees of federal agencies, such as the individually-named Defendants in this case, do not have the authority to decriminalize any activity. Plaintiff's claim that the refusal to allow Rastafarians to ingest marijuana is a violation of the equal protection clause because members of other religions are permitted to use wine or tobacco is irrelevant to any

claim that the use of marijuana should be decriminalized. This portion of Defendants' Motion should be granted.

## V.     Privacy Act Claims

Defendants aver that, to the extent Plaintiff makes a Privacy Act claim against Van Vandivier, a Bureau of Prisons' attorney, this Act does not provide for the recovery of damages against an individual. Defendants assert the records of an Inmate Administrative Remedy Record System are exempt from the Privacy Act. Defendants also assert that Defendant Vandivier provided information to the Court in another civil action regarding whether Plaintiff satisfied the exhaustion requirements of the Prison Litigation Reform Act, and he is immune from suit as a witness, even if the information he provided was false.

Plaintiff alleges the Bureau of Prisons is the only Defendant he makes Privacy Act claims against based on the declaration Defendant Vandivier provided in CV204-45. Plaintiff contends the Bureau of Prisons presented inaccurate records because his request through the RIC only entailed a marijuana request.

Pursuant to 28 C.F.R. § 16.97, the Inmate Central Record System is exempted from certain provisions of the Privacy Act, 5 U.S.C. § 552a[4]. See 28 C.F.R. §§ 16.97(a), (b)(3), (j), and (k)(2). More specifically, records from the Inmate Administrative Remedy Record System are exempt from the Privacy Act requirements, pursuant to 28 C.F.R § 16.97(a)(3). Even if, as Plaintiff contends, the BOP's records pertaining to his

---

[4] Given Plaintiff's assertions, it appears the relevant provision of the Privacy Act is 5 U.S.C. § 552a(d), which requires each agency that maintains a system of records to permit an individual to request an amendment of any record pertaining to him and make any corrections the individual believes is inaccurate or inform the individual of its refusal to amend the record. However, the BOP specifically is exempted from this requirement based on 28 C.F.R. § 16.97(a) ("The following systems of records are exempt from 5 U.S.C. 552a(d) . . . Inmate Administrative Remedy Record System[.]")

administrative remedies contain inaccuracies, the BOP does not have to amend these records. Plaintiff fails to state a claim based on violations of the Privacy Act. This portion of Defendants' Motion should be granted.

## VII.    Plaintiff's Verbal Assault Claim Against Defendant Ruiz

Defendants allege that Plaintiff fails to specify when Defendant Ruiz verbally assaulted him in order to force Plaintiff to violate his Ital diet. Defendants also allege there is no contention that Defendant Ruiz had any direct decision-making authority over the management of the manner in which inmates practice religion at FCI Jesup.

Plaintiff contends the incident with Defendant Ruiz involved more than words, as Defendant Ruiz would not accommodate his dietary needs and wanted to "break" Plaintiff by placing him in a dry cell with no water. (Doc. No. 40, p. 8). Plaintiff avers Defendant Ruiz's order caused him to suffer great physical harm because the Special Housing Unit officers would not help him get fruit and other items he could eat. Plaintiff also avers Defendant Ruiz's order caused him to starve, lose 17 pounds, and bleed when he had a bowel movement. Plaintiff further avers Defendant Ruiz's order led to a head injury because he was so weak from not being able to eat.

Even liberally construing Plaintiff's claims against Defendant Ruiz, as the Court must do on a Motion to Dismiss, he fails to set forth a substantive cause of action against Defendant Ruiz. Plaintiff's claims against Defendant Ruiz appear to be speculative, and, as such, are insufficient to survive a Motion to Dismiss. See Twombly, 550 U.S. at ___, 127 S. Ct. at 1969. This portion of Defendants' Motion should be granted.

## VIII. Administrative Procedures Act Claims

Defendants assert Plaintiff makes no specific allegations against any individual Defendant and does not cite any authority to support his claims that the Administrative Procedures Act ("APA") provides subject matter jurisdiction over his claims that Defendants' inaction is violative of his constitutional rights. Defendants also assert Plaintiff's claims for monetary damages against individual Defendants are not cognizable under the APA. Defendants further assert Plaintiff's claims for injunctive relief are subject to dismissal, as it is unclear which agency decisions he is challenging as being arbitrary, capricious, or unsupported by law.

Plaintiff contends his APA claims are against the Federal Correctional Facility in Jesup ("FCI Jesup") and the BOP for "not tak[ing] action and correcting its policy." (Doc. No. 40, p. 9). Plaintiff alleges the BOP provides Kosher toothpaste and other Kosher items for inmates of the Jewish faith, but the BOP will not provide him and other Rastafarian inmates with toothpaste, shampoo, soap, and other hygiene products which are not animal based products.[5] Plaintiff contends the BOP has not recognized any faiths in the prison other than Christianity, Judaism, and Islam.

Though Plaintiff is not so specific, he seemingly asserts that the BOP's alleged policy of religious discrimination and oppression is actionable under the APA's judicial review provision. That section provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review" of the agency action. 5 U.S.C. §702.

---

[5] Plaintiff's claims regarding hygiene products appear to be based on the APA.

Plaintiff has failed to make the most basic allegations as to how he is entitled to relief pursuant to the APA. Thus, this portion of Defendants' Motion should be granted.

## SUMMARY JUDGMENT STANDARD OF DETERMINATION

Summary judgment[6] should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 1260 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The moving parties bear the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no genuine issues of material fact. Hickson, 357 F.3d at 1260 (citing Celotex Corp. v.

---

[6] Those portions of Defendants' Motion which require the Court's reliance on documentation outside of the pleadings have been converted to a Motion for Summary Judgment. A court must ordinarily notify the parties of such a conversion and allow the parties ten (10) days to supplement the record. Trustmark Ins. Co. v. ESLU, Inc., 299 F.3d 1265, 1267 (11th Cir. 2002). However, "when a party proves through its actions that it has notice of the conversion [from a Motion to Dismiss to a Motion for Summary Judgment], any failure to notify the party is rightly deemed harmless." Id. at 1268. It is evident the parties were aware the Court would convert at least portions of Defendants' Motion to Dismiss to a Motion for Summary Judgment given the number of pleadings and supporting documentation filed with the Court.

Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  Id.  In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Acevado v. First Nat'l Bank, 357 F. 3d 1244, 1247 (11th Cir. 2004).

## DISCUSSION AND CITATION TO AUTHORITY

I.     **Plaintiff's Claims Against Defendants Mauldin, Schleder, Stearns, Fanucci, Harris, Santiago, and Kenney**

Defendants contend Plaintiff does not allege that Defendants Mauldin, Schleder, Stearns, Fanucci, Harris, Santiago, or Kenney had any personal involvement in the alleged failure to accommodate Plaintiff's religious practices, including the alleged denial of an Ital diet, ceremonial use of drums, procurement of marijuana, and the building of a tabernacle.  Defendants also contend Defendants Mauldin, Schleder, Stearns, Fanucci, Harris, Santiago, and Kenney had no involvement in the decision-making processes at the prison regarding these matters.

Plaintiff alleges that he was called to have a urine test and put "no consent" on the paper.  Plaintiff contends that the officer became concerned about Plaintiff not consenting to the test and called Defendant Stearns; Plaintiff also contends he told Defendant Stearns he did not consent for the testing of his urine for the presence of marijuana because marijuana is the sacramental herb for Rastafarians.  Plaintiff asserts Defendant Stearns told him his religion would never become a mainstream religion in

the United States, and that he told Defendant Stearns that "religious freedom is for all." (Doc. No. 40, p. 5). Plaintiff asserts he was locked up in the Special Housing Unit ("SHU"), where Defendant Mauldin interviewed him. Plaintiff alleges Defendant Mauldin agreed with Defendant Stearns' statements about Rastafarians and upheld Defendant Stearns' decision to place him in SHU. Plaintiff contends he then told Defendant Schleder what happened with Defendant Stearns, and Defendant Schleder became "irrational", spoke "disrespectful[ly], and supported [Stearns'] position against Rastafarians." (Id.) Plaintiff avers he was denied due process and physically suffered while he was housed in the SHU.

Plaintiff asserts Defendant Fanucci was the supervisor during the time he was housed in the SHU, and he failed "to take action to correct inhumane treatment violating the 8th Amendment and denial of 1st Amendment protection." (Id. at 6). Plaintiff contends Defendant Harris received his administrative remedies requests pertaining to the denial of his religious diet and failed to request a resolution, even though she was aware of Plaintiff's suffering in the SHU. Plaintiff also contends Defendant Harris upheld the "custom of violating [his] rights to be free from attack to change [his] faith." (Id.) Plaintiff asserts Defendant Harris was responsible for the initial destruction of his remedy requests and implemented a ten (10) month hold to keep him in the SHU due to religious indifference and in retaliation for filing administrative remedy requests. Plaintiff alleges Defendant Santiago was the Food Services Administrator, and he agreed with Defendant Ruiz to not accommodate Plaintiff's dietary needs in accordance with his religious needs. Plaintiff also alleges Defendant Santiago was told many times that the items for the no meat, self-select line contained animal byproducts, and Defendant

Santiago would not correct this problem. Plaintiff also contends Defendant Santiago would not provide him with peanut butter when he was in the SHU, causing him to starve. Plaintiff further contends he filed an administrative remedy request against Defendant Santiago for making "unprofessional statements" pertaining to the Ital tenets and for allowing the food to be prepared in the kitchen. (Id. at 7). Finally, Plaintiff asserts Defendant Kenney is liable for the legal guidance he gave to not correct the policy of not providing Plaintiff with a vegan diet. Plaintiff asserts Defendant Kenney's failure to take action or give proper legal advice caused him to suffer from the denial of his religious freedom and to suffer a permanent injury.

"It is well established in this circuit that supervisory officials are not liable under Bivens for unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003). However, supervisors "'can be liable . . . when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of plaintiff[], and his conduct was causally related to the constitutional violation committed by [the] subordinate.'" Id. (quoting Greason v. Kemp, 897 F.2d 829, 836 (11th Cir. 1990)). "A causal connection may be established when: 1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." Matthews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (internal citation omitted).

Defendants Harris, Santiago, Kenney, Schleder, Maudlin, Stearns, and Fanucci have provided Declarations in support of the Defendants' Motion. These Declarations reveal that Defendants Maudlin, Stearns, and Fanucci are lieutenants at FCI Jesup; Defendant Mauldin investigated the incident report which charged Plaintiff with refusing to provide a urine sample. Defendant Mauldin stated he may have told Plaintiff that, if he did not provide a proper urine sample, he could expect to receive an incident report; however, Defendant Mauldin denies having threatened Plaintiff. (Defs.' Ex. 23, ¶ 3). Defendant Mauldin also denies having planted marijuana or any other drug on Plaintiff. Defendant Mauldin further denies having acted inappropriately toward Plaintiff or denying Plaintiff the opportunity to practice his religion. (Defs.' Ex. 23, ¶ 6).

Defendant Stearns asserts he issued an Administrative Detention Order for Plaintiff to be placed in administrative detention while he was awaiting a hearing on charges of refusing to provide a urine sample and that this was his only involvement he had with Plaintiff. (Defs.' Ex. 24, ¶ 2). Defendant Stearns contends he did not act inappropriately or otherwise deny Plaintiff the opportunity to practice his religion, nor is he aware of anyone at FCI Jesup who has violated Plaintiff's religious rights. (Id. at ¶ 5).

Defendant Fanucci alleges he investigated the incident report after Plaintiff was placed in the SHU for refusing to provide a urine sample. Defendant Fanucci also alleges he was assigned as the SIS Lieutenant at the time Plaintiff was placed in administrative detention for having a positive urine test for the presence of marijuana. According to Defendant Fanucci, when the SIS office received positive results from an inmate's urine test, institutional protocol required the inmate to be placed in the SHU.

(Defs.' Ex. 26, ¶ 3). Like Defendants Mauldin and Stearns, Defendant Fanucci denies acting inappropriately against Plaintiff or not allowing Plaintiff the opportunity to practice his religion. Defendant Fanucci states he did not violate Plaintiff religious rights, and he is not aware of anyone who did so. (Id. at ¶ 6).

Defendant Schleder avers he is a Disciplinary Hearing Officer ("DHO") and conducted hearings and found Plaintiff guilty of five (5) offenses, including use of marijuana and refusing to provide a urine sample. Defendant Schleder asserts, for each occasion, Plaintiff was given written notice of the charges against him, 24-hours' prior notice of the hearing, the opportunity to have a staff representative, the opportunity to call witnesses, and to have written notification of his findings and the reasons therefor. (Defs.' Ex. 22, ¶¶ 2-3). Defendant Schleder denies violating Plaintiff's religious rights or his right to due process, and Defendant Schleder also denies knowing anyone who has violated Plaintiff's religious rights. (Id. at ¶ 6).

Defendant Kenney also submitted a declaration. Defendant Kenney asserts she is General Counsel/Assistant Director for BOP and her office is located in Washington, D.C. Defendant Kenney also asserts her responsibilities include advising the BOP's Director on legal matters and on major BOP-wide policy. Defendant Kenney contends she had no personal involvement in the issues alleged in Plaintiff's cause of action. (Defs.' Ex. 20, ¶¶ 1-3, 5).

Defendant Harris contends she is the unit manager on the Satellite Low facility at FCI Jesup, and, in her capacity, she and her staff help inmates with filing Administrative Remedy Requests and handle complaints in accord with the BOP's regulations for the Administrative Remedy program. Defendant Harris alleges she and her staff did not

destroy administrative filings, and they have not violated Plaintiff's right to practice his religion. (Defs.' Ex. 18, ¶¶ 1-3).

Finally, Defendant Santiago, the Food Services Administrator at FCI Jesup, contends Plaintiff has been on a religious diet since September 2005, and this religious diet is administered in accordance with Program Statement 4700.05.[7] (Defs.' Ex. 19, ¶ 1, 3). Defendant Santiago asserts the Ital diet is nearly vegan but can include some small fish. Defendant Santiago states he believes the Religious Diet Program at FCI Jesup does not meet "every facet" of the Ital diet but substantially complies with Plaintiff's dietary concerns. (Id. at ¶ 6). Defendant Santiago denies violating Plaintiff's right to practice his religion. (Id. at ¶ 9).

The undersigned has reviewed all of the documents Plaintiff has filed in this case, and the only response he has to the declarations filed by Defendants Harris, Kenney, Schleder, Mauldin, Stearns, and Fanucci is: "Defendants Fanucci, Ruiz, Santiago, Stearns, [and] Mauldin all through Religious Indifferences knowingly and willfully under the color of law persecuted me for my Religious Beliefs. As I sat in SHU starving, Ruiz, Fanucci, Harris, and Stearns all at times came by smiling and laughing at my condition." (Doc. No. 47, p. 2). Plaintiff also states he has not seen a "counter Affidavit contesting the facts held in his Affidavit/Response" showing the involvement of Defendants Fanucci, Harris, Santiago, and Kenney." (Doc. No. 51, p. 3). Plaintiff contends Defendant Harris began destroying his administrative remedies. Plaintiff also contends Defendant Santiago was not just a supervisor and that he upheld the denial of any religious accommodation due to his religious indifference. Plaintiff contends

---

[7] The assertions set forth in Defendant Santiago's declaration will be discussed in greater detail later in this Report.

Defendant Santiago's actions caused him to suffer a head injury[8] and were upheld by Defendants Harris and Fanucci. Finally, Plaintiff asserts Defendant Kenney is liable for upholding the BOP custom of not providing the same accommodations to Rastafarians as it does to inmates of other faiths. (Id.)

Plaintiff has offered no evidence which creates a genuine issue of material fact as to whether Defendants Harris, Santiago, Kenney, Schleder, Maudlin, Stearns, and Fanucci should be held liable for the alleged violations of Plaintiff's rights based on anything other than these Defendants' positions with the BOP. Plaintiff sets forth only general allegations against these Defendants, and his allegations are unsupported by facts or evidence. Defendants' Motion should be granted as to this claim, and Plaintiff's claims against Defendants Harris, Santiago, Kenney, Schleder, Maudlin, Stearns, and Fanucci should be dismissed.

## II. First Amendment/Religious Freedom Claims[9]

Defendants contend they have not placed unreasonable burdens on Plaintiff's right to practice his religion. Defendants assert that, assuming Plaintiff's requests for certain religious accommodations have been denied, the decisions to deny Plaintiff's requests were reasonably related to the compelling government interest of security and safety of staff and inmates in a penological setting. Defendants also assert BOP officials have accommodated Plaintiff and his religious beliefs. Defendants further assert the BOP has several resources available, which outline the tenets of the different

---

[8] In other instances, Plaintiff contends Defendant Ruiz's actions caused his alleged head injury.

[9] Given the undersigned's recommended disposition of Plaintiff's claims against the BOP, FCI Jesup, and Defendants Van Vandivier, Vanyur, Ruiz, Harris, Kenney, Schleder, Mauldin, Stearns, Fanucci, and Santiago, Plaintiff's free exercise claims will be analyzed as being made against Defendants Vazquez, O'Neill, Cooksey, Erlewine, Van Balaan, McFadden, Kennedy, and Holt.

religions inmates housed in federal penal institutions practice, to inform and guide staff and wardens. Defendants contend the BOP has an operations memorandum which outlines holidays Rastafarians observe, and this memorandum is updated every year.

Plaintiff asserts BOP officials completely have denied him the ability to practice his mandatory Rastafarian tenets while these officials have allowed other inmates the free exercise of the tenets of their faiths. Plaintiff contends BOP officials have denied him the reasonable opportunity to exercise his right under the free exercise clause of the First Amendment to have an Ital diet, to wear a turban, to have an outside tabernacle, to fast during his Sabbath, and to have his sacramental herb and ceremonial drums. Plaintiff asserts that the operations regulation Defendants cite to contains several inaccuracies because it does not properly define the Ital diet or law or describe the Nyanbinghi ceremony or the tabernacle.

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4, forbids the government from "substantially burden[ing] a person's exercise of religion"[10] unless the government can "demonstrate[ ] that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Id. § 2000bb-1(b). Although the Supreme Court has declared RFRA unconstitutional as applied to the states, City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997), RFRA still applies to acts of the federal government and its officials. See Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006) (stating that pursuant to RFRA, the federal

---

[10] "Exercise of religion" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5.

government must demonstrate a compelling interest when substantially burdening the exercise of religion). The "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'-- the particular claimant whose sincere exercise of religion is being substantially burdened." Id. at 430-31, 126 S. Ct. at 1220 (quoting 42 U.S.C. § 2000bb-1(b)). "A 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004). "[I]n order to constitute a 'substantial burden' on religious practice, the government's action must be 'more than incidental' and 'must place more than an inconvenience on religious exercise.'" Smith v. Allen, 502 F.3d 1255, 1277 (11th Cir. 2007) (quoting Midrash Sephardi, 366 F.3d at 1227. "That is, to constitute a substantial burden, the governmental action must significantly hamper one's religious practice." Id. However, in the context of prisons, "courts [should] afford deference to the judgment of prison officials." Lawson v. Singletary, 85 F.3d 502, 509 (11th Cir. 1996). Once a plaintiff establishes that a regulation imposes a substantial burden on the exercise of his religion under RFRA, the "burden shifts to the government to demonstrate that 'application of the burden' to the claimant 'is in furtherance of a compelling governmental interest' and 'is the least restrictive means of furthering that compelling governmental interest.'" Kikumura v. Hurley, 242 F.3d 950, 961-62 (10th Cir. 2001) (quoting 42 U.S.C. § 2000bb-1(b)).

Defendants[11] submitted the declaration of Defendant James O'Neill, who is the Chaplain at FCI Jesup and was the supervisory Chaplain during the relevant period. O'Neill states the BOP and FCI Jesup have Program Statements and Policy Directives in place to provide guidance to staff in accommodating the religious practices of the diverse populations at the prison and balancing these accommodations against the need for security within the prison. Defendant O'Neill asserts Program Statement 5360.09, Technical Reference Manual T5360.01, and Institution Supplement JES 5360.09 were followed when staff handled Plaintiff's requests. Defendant O'Neill also asserts he received information from the official BOP contact person for the Rastafarian religion that Rastafari Bobo (Shanti) Ashanti Order of Melchizedek is an authorized group under the Rastafarian religion, but he had no other information on that group. (Defs.' Ex. 2, ¶ 7). Defendant O'Neill asserts Plaintiff sought to have this group recognized as a religion at FCI Jesup, and as part of his recognition request, Plaintiff stated he wanted to use marijuana, receive a special diet and soaps, and burn a fire for several days outside. Defendant O'Neill states he asked Plaintiff to provide additional information to aid in whether these things should be permitted; Plaintiff provided some articles but no official documentation. (Id. at ¶ 6). Defendant O'Neill contends the former warden recommended to the Religious Issues Committee ("RIC") that Plaintiff's request for marijuana be denied since the use of marijuana is illegal, the request for a fire be denied since it created a security concern for inmates to be on the recreation yard for 24 hours a day for three (3) days, and the special diet and soaps be denied

---

[11] It seems to the undersigned that Plaintiff's claims against Defendants Cooksey, Erlewine, Van Balaan, Kennedy, and Holt would be best considered in light of respondeat superior principles. However, because Defendants' counsel did not include these Defendants in the respondeat superior section of Defendants' Motion and Brief in support thereof, the undersigned, in fairness to the pro se Plaintiff, will not do so.

because there was not enough information. The RIC recommended to the new warden, Robert McFadden, that the group Plaintiff stated he was a member of should be recognized as a religious group within the Rastafarian religion. The RIC concurred with the former warden that the use of marijuana posed a significant security concern and that this request not be accommodated. The RIC determined, after a review of Plaintiff's submitted materials, that his dietary request would be best accommodated by self-selection and the no-flesh option available on the food service main line. The RIC recommended that FCI Jesup consider selling soy products through the commissary. (Id. at ¶ 11). Defendant O'Neill recognizes Rastafarians are encouraged to eat an Ital diet, which, as he understands, consists of small fish, fruits, and vegetables. FCI Jesup's Food Services Department offers an alternative to the Ital diet through the self-select non-flesh option, which allows selection of meat substitutes such as peanut butter. Defendant O'Neill avers inmates can select salad and fruit items from the salad bar. According to Defendant O'Neill, Plaintiff rejected the non-flesh option menu and requested that he be placed on the religious diet program which offers more strict Kosher foods. Plaintiff's request was granted in September 2005. (Id. at ¶ 16). Defendant O'Neill contends soy milk, mackerel fillets, salmon, refried beans, rice, kosher bread, vegetable soups, nuts, cheeses, and fresh fruit are sold in the commissary for inmates to buy. (Id. at ¶ 19). Defendant O'Neill states Rastafarians are permitted to wear crowns containing red, yellow, green, or black, which cannot have a bill or peak or symbols; Defendant O'Neill has witnessed Plaintiff wearing a crown. Defendant O'Neill also states turbans are not authorized headgear for members of the Rastafarian religion. Defendant O'Neill asserts Plaintiff asked that a large set of congo

drums be purchased, even though he had access to a small set of congo drums in the chapel area. Defendant O'Neill states he denied Plaintiff's request for a larger set of drums because there was a set available to Plaintiff and because there was no documentation that using large congo drums is a mandatory tenet of the Rastafarian religion. Despite Defendant O'Neill's denial, however, the Recreation Department bought a set of large congo drums for use by the general inmate population which are available to Plaintiff to use during religious ceremonies. Defendant O'Neill observed Plaintiff mainly using the small congo drums. (Id. at ¶ 18). Defendant O'Neill asserts he is unaware of Plaintiff making an official request to the RIC for an outdoor tabernacle, but Plaintiff requested to have a three (3) day fire, which was denied due to staffing and security concerns because inmates would be out of their cells for three (3) days in a row. (Id. at ¶ 21).

Defendant Paul Kennedy also submitted a declaration in support of Defendants' Motion. According to Defendant Kennedy, who is the Chaplaincy Services Administrator for the Southeast Regional Office of the BOP, he provides advice and policy guidance to BOP chaplains and other staff within this Region. Defendant Kennedy states he reviewed Plaintiff's requests regarding his religion and prepared a memorandum for the Regional Director. Defendant Kennedy asserts he recommended Plaintiff's group meet with the Rastafarian group, which already met at FCI Jesup, in light of the similar beliefs and practices. Defendant Kennedy also asserts the memorandum recommended Plaintiff's requests not be granted until further supporting documentation was provided. Defendant Kennedy asserts the Regional Director signed

this memorandum and forwarded it to the RIC at the Central Office; the RIC made its recommendations to the Warden. (Defs.' Ex. 3).

Regional Director R. E. Holt also submitted a declaration in which he states he has very limited involvement with specific institutional programs, as he is responsible for the general supervisory management and oversight of the operations of this Region. Defendant Holt also states he accomplishes his job with assistance from the wardens, institutional staffs, regional level administrators and staff, and other BOP personnel. Defendant Holt further states he has no direct involvement with the provision of religious services to inmates. Defendant Holt asserts he reviewed the memorandum Defendant Kennedy prepared and signed the memorandum, which was then forwarded to the Central Office for review by the RIC. Defendant Holt contends this was the extent of his involvement with the issues Plaintiff raised in his Complaint. (Defs.' Ex. 4).

Susan Van Baalen, the Chief of Chaplaincy Services, states in her declaration that she provides services and guidance on permissible religious practices within BOP institutions to BOP regional and institutional chaplains. Defendant Van Baalen also is a member of the RIC, which reviewed Plaintiff's request for the Bobo Shanti sect to be allowed to meet and function as a religious group at FCI Jesup. Defendant Van Baalen asserts the RIC made recommendations as to Plaintiff's requests, but it was for the warden to decide what accommodations would be allowed at FCI Jesup. Defendant Van Baalen denies interfering with Plaintiff's right to practice his religion and does not know of anyone who did. (Defs.' Ex. 5).

Defendant Erlewine was employed as the Assistant Director/General Counsel for BOP until his retirement in June 2004. Defendant Erlewine contends that it was his

practice to have recommendations made by the RIC reviewed by members of his staff to ensure the recommendations were legally sound. Defendant Erlewine asserts he reviewed the RIC's recommendation as to Plaintiff's request to have the Bobo Shanti sect be able to meet and function as a religious group, and he agreed with the RIC's recommendation. Defendant Erlewine also asserts he signed the memorandum containing the RIC's recommendation, and this recommendation was forwarded to the Warden at FCI Jesup, who ultimately decided what accommodations to make for Plaintiff. (Defs.' Ex. 9).

Defendant Michael Cooksey was employed as the Assistant Director of the Programs Division with the BOP, and, like Defendant Erlewine, he retired in 2004. Defendant Cooksey asserts part of his responsibilities included signing recommendations from the RIC which were forwarded to wardens at the BOP facilities. Defendant Cooksey states he reviewed the RIC's recommendation on Plaintiff's request about the Bobo Shanti sect, agreed with the recommendation, and signed the memorandum. Defendant Cooksey also states the memorandum was forwarded to the Warden at FCI Jesup, who ultimately decided what accommodations to make for Plaintiff. (Defs.' Ex. 10).

Defendant Robert McFadden, the warden at FCI Jesup from April 2003 until September 2004, asserts that, as the warden, it was his responsibility to implement BOP policies within the prison. Defendant McFadden alleges he received the RIC's recommendation regarding Plaintiff's requests for religious accommodations. After reviewing the RIC's recommendation and consulting with Chaplain O'Neill, Defendant McFadden determined Plaintiff and other members of the Bobo Shanti sect would be

permitted to attend worship services twice a week with other members of the Rastafarian religion, but the Bobo Shanti would not receive standing as a separate religion. Defendant McFadden states the prison would not accommodate Plaintiff's request to smoke marijuana because it is illegal to do so and in clear violation of BOP policy. Defendant McFadden also states Plaintiff's dietary concerns could be appropriately met through the no-flesh option and salad bar offered at the prison. Defendant McFadden contends Plaintiff's request for a three day fire was denied because of the security concerns associated with allowing inmates to remain outside for three consecutives days with an open fire pit and limited staffing. Defendant McFadden asserts Plaintiff still was permitted to wear the crown and to celebrate holy days in accordance with the recognized tenets of the Rastafarian religion, as he was already doing. (Defs.' Ex. 8).

Defendant Jose Vazquez was the Warden at FCI Jesup from October 2004 until his retirement in May 2007. Defendant Vazquez alleges he was responsible for general supervisory management and oversight of the operation of the institution, with the help of BOP personnel, management, and line staff. Defendant Vazquez also alleges the RIC's recommendations for Plaintiff's requests were in place at FCI Jesup when he became Warden. Defendant Vazquez further alleges the Religious Programs Department at FCI Jesup accommodated Plaintiff's requests for religious services to the extent his requests posed no threat to the security of the institution or the laws of the United States. (Defs.' Ex. 11, ¶ 4). Defendant Vazquez avers Plaintiff and other members of the Rastafarian religion are permitted to meet in the chapel twice a week, to use congo drums and incense during their ceremonies, and to wear the approved

religious headgear, the crown or tam. Defendant Vazquez alleges the Rastafarians' major holy days are recognized, and ceremonial meals and programs are provided. Defendant Vazquez also alleges community leaders of the Rastafarian religion are invited to meet with Rastafarian inmates. Defendant Vazquez states Plaintiff's request for a turban was denied because BOP policy did not permit this, but does allow members of the Rastafarian religion to wear a crown or tam. Plaintiff's request for marijuana was denied because it is an illegal substance. Defendant Vazquez asserts he does not recall Plaintiff requesting an outside tabernacle. Finally, Defendant Vazquez asserts he approved Plaintiff's request to be placed on the religious diet program in September 2005, which went beyond the RIC's recommendation that his dietary needs could be accommodated with the self-selection, non-flesh option. Defendant Vazquez states he made this exception in an attempt to appease Plaintiff when he went on a hunger strike. (Id. at ¶ 7).

Defendants also submitted a copy of Program Statement P5360.09[12], which pertains to inmates' Religious Beliefs and Practices. (Defs.' Ex. 6). According to this Program Statement, the "ingestion of illegal substances" is a religious practice which is not authorized. (Defs.' Ex. 6, p. 5). This Program Statement allows inmates to wear religious headwear, including Rastafarians who are permitted to wear multi-colored crowns. (Id. at 13). Program Statement P5360.09 also outlines dietary practices for inmates, which allows "inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice[s] within the constraints of budget limitations and the security and orderly running of the institution." (Id. at 17). The

---

[12] This Program Statement outlines the role of the RIC, which the undersigned will not discuss at this point of his Report given the extensive reference to the Statement and the RIC's role by many of the Defendants in their declarations.

religious diet program (alternative diet program) has two (2) components: 1) self-selection from the main line, which includes a no-flesh option and access to the salad/hot bar where this bar is part of the Food Services Program, and 2) dietary accommodation through nationally recognized, religiously certified processed foods. (Id. at 17-18).

Defendants also have submitted Program Statement 4700.05, and this Statement includes a chapter on the Religious Diet Program and became effective in June 2006. This Statement sets forth that a no-flesh protein option will be provided at both the noon and evening meals whenever an entrée containing flesh is offered, vegetables and starches seasoned with flesh will have a no-flesh alternative, and that an "enhanced no-flesh option will create an attractive self selection component which may meet the needs of inmates who might otherwise request participation in the certified food component." (Defs.' Ex. 19, Att. 1, Ch. 4, p. 1). According to this Statement, all prepared foods purchased for use on the certified food component will be ready to use and certified by a nationally recognized Orthodox standard. Equipment or utensils which come into direct contact with any food other than uncut fruits and vegetables being served on the certified food menu "must be easily identified for certified food component use only . . . and stored separately from items used elsewhere" in the Food Services Department. (Id.) Program Statement 4700.05 calls for the equipment used to clean other equipment or utensils used for the certified food component to conform to the wash, rinse, and sanitize requirements and to be used in the certified food component. Certified food component meals are to be served with

disposable trays, plates, cups, and eating utensils, and reusable materials may be used if they conform to storage and washing components of the Statement. (Id. at pp. 1-2).

FCI Jesup also has an Institution Supplement to Program Statement P5360.09 in place, JES 5360.09. The purpose of the supplement "is to establish procedures and guidelines for staff and inmates at the Federal Correctional Institution, Federal Satellite Low and the Satellite Camp in Jesup, Georgia regarding religious beliefs and practices." (Defs.' Ex. 28, p. 1). An inmate's headwear is to be consistent with his religious preference, and Rastafarians at FCI Jesup are allowed to wear crowns or tams, primarily black with red, gold, and green stripes around the center. (Id. at 6).

Finally, Defendants submitted Technical Reference Manual T5360.01, Inmate Religious Beliefs and Practices. This manual recognizes the dietary requirements of certain faiths, including the Rastafarian faith. This manual also recognizes that some Rastafarians eat Ital foods and that the dietary needs for these inmates "can be best met by self-selection from the main line which includes the no-flesh option. . . . Fish, however, is a staple of Ital foods as long as the fish is small, not more than 12 inches long. . . . [M]any Rastafarians are vegetarians." (Defs.' Ex. 29, p. 4). This manual also provides an outline of the religious practices of the Rastafarians, and the Bobo Shanti is identified as a major group within the Rastafarian religion. (Defs.' Ex. 29, pp. 9-10). According to this outline, the use of "ganja", the name given to a specifically cultivated type of Indian hemp, is one of the ways members develop insight into their beliefs which is not available by any other means. (Id. at p. 8). This manual states the use of ganja by Rastafarians is biblically based, according to the Rastafarian beliefs, and this "holy herb" is used to provide a new understanding of self, the universe, and God. (Id. at p.

9). In addition, Bobo Shanti members wear a headdress which looks like a "stylized turban." (Id. at p. 10).

Plaintiff has submitted a number of documents in support of his position that Defendants have violated his religious rights.[13] Plaintiff submitted the response to the appeal of his administrative remedy request denying the wearing of turbans for Rastafarians as religious headwear. Plaintiff was informed that the warden could allow certain items to be worn or used in the institution, consistent with considerations of security, safety, or good order. Plaintiff was also informed that religious headwear was standardized in order to provide security, safety, and orderly running of the institutions and assist in minimizing complications with inmate personal property. Based on these considerations, Plaintiff was informed Rastafarians are allowed to wear crowns as a least restrictive alternative available to accommodate their religious headwear needs. (Doc. No. 1, Ex. 1, p. 10).

Plaintiff has also submitted what appears to be his handwritten response to a "Questionnaire regarding New or Unfamiliar Religious Components." According to this document, Rastafarians are strict keepers of the Ital diet, which consists of organic vegetables and soy product for meat and dairy substitutes, and are not to have food prepared in areas where meat is prepared. The Ital diet is the Ital means of separating or purifying Rastafarians to be a temple of Rastafari. According to this same document, congo drums, a kettle drum, and the sacramental herb (ganja) are necessary for the practice of Rastafarianism. This document also lists several days considered to be holy within the Rastafarian religion, which are to occur with drumming in the tabernacle

---

[13] Plaintiff does not offer any insight as to the origin of his religious information, and much of his information appears to be piecemeal. The undersigned will attempt to consolidate this information in a logical manner.

around the alter, just as the Indians have a sweat lodge outside with the fire burning.[14] (Id. at Ex. 6, pp. 5-10).

According to another document Plaintiff has submitted, Rastafarians use ganja for smoking, eating, drinking, and massaging, and ganja is considered to be a holy herb, not a drug. Ganja is called the "wisdom weed" and the "spiritual meat" of the Rasta culture, and its use is justified by the first page of the Bible. (Id. at p. 18). Rastafarians, through the usage of ganja, feel themselves to be "divinely inspired—experiencing the same magnificence of spirit and oneness with Nature which Moses must have experienced 'high' on the mountain top in the form of 'burning bush' (herbs), as did Jesus 'high' on top of [M]ount Sinai." (Id.)

Rastafarians are to eat only "agridishes", or foods which grow from the earth, and are considered Ital—total or natural foods which are not contaminated or denatured by any processing, additions, or deletions. (Doc. No. 1, Pl.'s Ex. 7, p. 7). Rastafarians believe that, when the first people were created, Jah (the Rasta name for "God") specified that all herbs bearing seeds and trees bearing fruit would be meat for them, and orthodox Rastafarians follow this dictate and refuse "to soil and desecrate his or her system by consuming inferior beings or dead flesh." (Id., Doc. No. 40, Ex. 4, p. 8). Rastafarians do not consume meat, fish, eggs, poultry, or canned food, which make the stomach a cemetery because these things are "dead". (Doc. No. 1, Ex. 7, p. 7). Rastafarians are not to eat meat, fish, eggs, salt, sardines; white flour products such as bread, buns, cake, or gravy; or beverages such as milk, cocoa, coffee, or soda. (Id. at p. 10). "A real, true Rasta will choose the Ital diet, but he or she has no choice in the

---

[14] This seems to describe the Nyahbinghi ceremony and the fire which should be held in the tabernacle. (Pl.'s Ex. 6, pp. 15-16).

matter. If you are going to reach into life everliving, you must eat divinely, *of* life everliving." (Id. at p. 11)(emphasis in original).

## A. Religious Diet

Defendants aver an inmate can request to be included on the BOP's religious diet program and that this program has two (2) components. The first component is "self-selection from the main line, which includes a no-flesh option and access to the salad/hot bar (where the salad/hot bar is part of the Food Service program"; the second component is "accommodation of dietary needs through nationally recognized, religiously certified processed foods with access to the salad bar only." (Doc. No. 37, p. 26). Defendants assert the BOP recognizes some Rastafarian inmates eat an Ital diet, which forbids the consumption of various meats, and, as a result, many Rastafarians are vegetarians. Defendants also assert the Technical Reference Manual ("TRM") advises that the Rastafarians' dietary needs ordinarily can be met by self-selection from the main line, which includes a no flesh option. Defendants contend staff at FCI Jesup provide for the religious dietary needs of Rastafarian inmates in the manner proscribed by the TRM, which has become more flexible. Defendants allege Plaintiff has been on the religious diet since September 15, 2005, and has the opportunity to select non-meat foods from the salad bar. Defendants aver inmates who are in the religious diet program eat from certified food menus, and these menus include no flesh protein options, kosher meats, fresh fruits and vegetables, starches, and nutritionally sound alternatives to main line dishes. Defendants also aver that, pursuant to the religious diet menu, equipment and utensils which come into direct contact with any food, excluding uncut fruit or vegetables, are separated. Defendants further aver separate

items are used solely for the religious diet program including utensils, food preparation items, cooking items, and a microwave oven. Defendants contend the meals are served with disposable tray, plates, cups, and eating utensils. Defendants assert Rastafarians housed at FCI Jesup are provided with ceremonial meals each year, and these meals are funded by the Food Services Department. Defendants also assert the Food Services Department serves fruits and vegetables for the annual ceremonial meal days, and fish is available for purchase at the commissary.

Plaintiff contends that, even though the policy explains the existence of two diets, this is not the case because the self-selection is the same as the general meal and is prepared however the Food Services Department sees fit. Plaintiff alleges everything, including the white rice and beans, is cooked in violation of the Ital laws. Plaintiff also alleges that if an inmate has no money, he will starve, just as Plaintiff has, and this is an unbearable burden. Plaintiff asserts the religious diet of certified processed foods also provides for chicken, fish, egg, and beef as the protein choices, which are forbidden by the Ital law. Plaintiff also asserts replacing these protein choices with tofu or soy products would remove any burden, as there is no compelling reason to not provide a healthy diet in accordance with religious requirements.

The evidence before the Court indicates adhering to the Ital diet is a central tenet of the Rastafarian religion; however, this evidence also indicates that Defendants have not substantially burdened the exercise of this facet of Plaintiff's religion. For example, Defendant Santiago, the Food Services Administrator at FCI Jesup, states in his Declaration that Plaintiff has been on the religious diet program since September 2005. Defendant Santiago states inmates in this program eat from certified food

menus, which include no-flesh protein options, kosher meats, fresh vegetables, fruits, and starches and are certified by nationally recognized orthodox standards. Pursuant to this Program, equipment and utensils which come into contact with any food, except uncut fruit and vegetables are separated and that separate items are used exclusively for the religious diet program. (Defs.' Ex. 19). Defendant Santiago states his belief that, while not every facet of the Ital diet is met by the religious diet program, it substantially complies with Plaintiff's dietary needs. Plaintiff can also supplement his diet through purchasing items such as re-fried beans, rice, peanut butter, mixed nuts, peanuts, pecans, and fresh fruit. (Id.) A review of the Certified Food Menu reveals that, over a 14 day period, inmates on the certified food program are offered fresh fruit, whole wheat bread, vegetables, beans, oatmeal and other grains, and peanut butter, and that many of these options are offered on a daily basis. (Ex. 2 attached to Defs.' Ex. 19). Plaintiff's assertion that Defendant O'Neill has denied him the common fare tray to at least eat vegetables is undermined by the undisputed evidence that Plaintiff has been on the religious diet program since September 2005 and that this menu offers several vegetable and fruit options on a daily basis. (Doc. No. 41, p. 2). Plaintiff also asserts Defendants have denied him a protein option all together[15] and this is slowly tearing down his body since he is anemic. Plaintiff further asserts he buys "large [amounts] of peanut butter from [the] commissary to eat", which has raised his cholesterol to a dangerous level. Plaintiff also states he cannot eat when he has no money. (Id.) While the undersigned empathizes with Plaintiff, his assertions do not rise to the level of showing the actions of Defendants have caused a substantial burden on his religious

---

[15] Plaintiff appears to contradict himself when he states he is denied the common fare tray to eat the vegetables and then states in the next paragraph that, if he eats anything off the mainline, he will be denied the common fare tray. (Dec. No. 41, ¶¶ 9-10).

exercise of enjoying an Ital diet. It appears the BOP and members of the FCI Jesup staff have attempted to make accommodations to Plaintiff, either through the menu offered by the Food Services Department or through items carried in the prison's commissary. Plaintiff's alleged anemia, dangerous cholesterol level, and lack of money, though perhaps evidence of other issues not before the Court, are not evidence of Defendants placing a substantial burden on the exercise of Plaintiff's sincerely held belief in adhering to the Ital diet. The BOP accommodates Plaintiff and all inmates on the religious diet "within the constraints of budget limitations and the security and orderly running" of the institution. Program Statement P5360.09, p. 17. In addition, Plaintiff has the opportunity to purchase items from the commissary, even if he cannot afford to do so on a regular basis. This portion of Defendants' Motion should be granted.

## B. Congo Drums

Defendants contend the BOP's TRM acknowledges that Rastafarians use drums in their ceremonies. Defendants also contend Plaintiff asked for a large set of drums in 2005, and this request was denied because there were smaller congo drums available for Plaintiff and there was no documentation that larger congo drums were a mandatory tenet of the Rastafarian religion. Defendants further contend that later in 2005, the Recreation Department bought a larger set of congo drums for general use by the inmate population, including during religious ceremonies.

Plaintiff asserts the Rastafarians do not require any ordinary congo drums, but in fact need to have Nyahbinghi drums for their ceremonies. Plaintiff alleges that Defendant O'Neil was given a guideline booklet, which showed the three (3) drums

needed are the funde, repeater, and a bass, not just a congo drum. Plaintiff also alleges Indians were granted their ceremonial drums, Muslims are provided with prayer rugs, and Catholics are provided with ceremonial robes, oils, candles, and sacraments; Plaintiff asserts not providing the Rastafarians with their drums is an example of inequitable treatment, and is a burden on the exercise of his religion without a compelling justification.

There is no evidence before the Court that the practice of Rastafarianism requires the use of three (3) separate drums, and, as such, the BOP's failure to provide a set of three (3) drums cannot constitute a substantial burden on this facet of Plaintiff's religion. The only evidence the Court has been provided regarding drums is an email from Cashawn Myers to Reverend Ford with the BOP, which indicates the funde, kete, and thunder drum set costs $1000.00, (Doc. No. 40, Ex. 5), and that drums for ceremonies consist of congo drums and a kettle drum, according to Plaintiff's handwritten response for request for more information. (Doc. No. 40, Ex. 1, p. 2). Even assuming these three (3) specific drums are requirements of the Rastafarian faith, Plaintiff and any other Rastafarians at FCI Jesup have access to two sets of congo drums—a small set and a large set. Plaintiff has not shown that not having these three (3) particular drums constitutes a substantial burden on the exercise of his religion. Thus, this portion of Defendants' Motion should be granted.

### C. Tabernacle

Defendants assert the TRM does not address having a tabernacle available for inmates. Defendants contend Defendant O'Neill does not recall Plaintiff ever requesting

a tabernacle from the Religious Issues Committee. Defendants aver Plaintiff requested a three (3) day burning fire, which was denied due to staffing and security concerns.

Plaintiff contends the outside tabernacle is a central pillar in the Nyahbinghi ceremony, and he requested the tabernacle, as evidence by his Freedom of Information Act request attached to his original Complaint. Plaintiff contends the BOP did not address this matter because Defendant O'Neill wanted to deny all of the Rastafarian tenets. Plaintiff also contends he and Defendant Vazquez spoke about his request for an outside tabernacle, and Defendant Vazquez referred the matter to Assistant Warden Jacobson. Plaintiff contends this request was denied again and constitutes a burden on the exercise of his religion without a compelling justification.

From the best the undersigned can ascertain, the tabernacle Plaintiff speaks of is to be used during the Nyahbinghi ceremony and that a "fire should burn unceasingly during the days of the Nyahbinghi." (Doc. No. 1, Ex. 6, pp.14-16). Assuming without deciding that having an outside tabernacle (and the attendant fire) is a mandatory tenet of the Rastafarian religion, it would appear that Defendants have placed a substantial burden on the exercise of religion. However, Defendants' assertion that Plaintiff's request for an outside tabernacle and fire cannot be honored because doing so would require inmates to be out of their cells for three (3) days continuously and would pose staffing and security concerns is a compelling governmental interest to justify this burden. In addition, the BOP allows Rastafarians to meet twice a week for worship services, which appears to be the least restrictive means to allow Plaintiff to have a place of worship at his disposal. This portion of Defendants' Motion should be granted.

### D.    Turban

Defendants allege that the BOP does not restrict all religious headgear, but Plaintiff's request to wear a turban was denied because BOP policy does not authorize turbans for Rastafarians, only crowns and tams.

Plaintiff contends the BOP's TRM states that Bobo Shanti Rastafarians wear turbans and nothing else.  Plaintiff asserts the BOP gives the different sects of the Muslim faith all of their religious items but does not do so for the different sects of the Rastafarian faith, which is in violation of his right to equal protection.  Plaintiff contends he was ordained as a priest and wearing the turban is a requirement of his faith. Plaintiff alleges the BOP could allow the colors of the turbans to be restricted to black, green, and gold.  Plaintiff also alleges the Sikh are allowed to wear turbans, and to deny Bobo Shanti Rastafarians the wearing of the turban does not advance any security concerns.

The only information before the Court regarding the wearing of turbans is that members of the Bobo Shanti sect of the Rastafarian religion "generally do not wear colors on their headdress, which looks like a stylized turban." (Doc. No. 1, Ex. 6, p. 55). However, in general, Rastafarians wear crowns or tams containing red, yellow, green, and/or black. (Id. at p. 53).  Plaintiff has offered no evidence that wearing a turban is a mandatory tenet of his particular sect of the Rastafarian religion, and, even if this were the case, there is no indication that only being permitted to wear a crown or a tam, rather than a turban, constitutes a substantial burden on the exercise of his religion. Plaintiff has failed to satisfy his burden pursuant to RFRA, and thus, this portion of Defendants' Motion should be granted.

**E.    Marijuana**

Defendants assert the BOP does not permit inmates to use or possess marijuana, even in the name of religious practices.  Defendants also assert Plaintiff's assertion that the BOP provides Native Americans with peyote is without merit.

Plaintiff contends the use of marijuana as a sacramental herb must be measured against the use of other sacraments used by other religious sects, such as wine for Catholics and tobacco/sage for Native Americans.  Plaintiff asserts his religion is being treated differently than other religions.  Plaintiff also asserts the RIC has not presented evidence of how it determined what the compelling interest is to deny marijuana use for sacraments or that the security measures taken for wine and tobacco could not work with marijuana.

The evidence before the Court indicates that the ingestion of ganja is believed to lead Rastafarians to a more enlightened spiritual plane, and this evidence also indicates that Plaintiff being unable to use ganja is a substantial burden on the exercise of his religion.  However, as advanced by Defendants, ganja (or marijuana) is a prohibited substance under the Controlled Substances Act as well as BOP regulations.  The undersigned notes Plaintiff's reliance on the O Centro Espirita case.  In that case, the Supreme Court determined "the courts below did not err in determining that the Government failed to demonstrate, at the preliminary injunction stage," that it had a compelling interest in barring the members of the Christian Spiritist sect from using a banned herb, *hoasca*, for sacramental purposes.  O Centro Espirita, 546 U.S. at 439, 126 S. Ct. at 1225.  Nonetheless, in that case, members of the sect contesting the

Government's ban were not confined in prison; in accordance with applicable case law, the Court cannot ignore the context in which Plaintiff is not permitted to use ganja. Plaintiff is imprisoned. See id. at 430-31, 126 S. Ct. at 1220. The Court should yield to the BOP's discretion, and the outright ban of marijuana use by its charges appears to be the least restrictive means to justify any burden placed on the exercise of Plaintiff's religion. This portion of Defendants' Motion should be granted.

Having found Defendants have satisfied the more stringent test associated with alleged violations of the RFRA, it is unnecessary to discuss Plaintiff's claims that his constitutional right to the free exercise of religion has been impinged, as the analysis of these claims reveals a defendant has a much lower obstacle to overcome.[16] It is also unnecessary to address the remaining ground upon which Defendants have moved for dismissal of Plaintiff's claims.[17]

---

[16] The Free Exercise Clause of the First Amendment "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." Cutter v. Wilkinson, 544 U.S. 709, 719, 125 S. Ct. 2113, 2120, 161 L. Ed. 2d 1020 (2005). Prisoners retain their First Amendment rights, including rights under the free exercise of religion clause; however, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Brunskill v. Boyd, 141 Fed. Appx. 771, 774 (11th Cir. 2005) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404, 96 L. Ed. 2d 282 (1987)). Deference is given to prison officials, and, as a result, courts employ a "reasonableness" test to determine whether a regulation infringes constitutional rights. Id. The Supreme Court has outlined four factors to be considered in determining the reasonableness of a regulation: (1) "whether the regulation has a valid, rational connection to a legitimate governmental interest;" (2) "whether alternative means are open to inmates to exercise the asserted right;" (3) "what impact an accommodation of the right would have on guards and inmates and prison resources;" and (4) "whether there are ready alternatives to the regulation." Turner v. Safley, 482 U.S. 78, 89-91, 107 S. Ct. 2254, 2262, 96 L. Ed. 2d 64 (1987). The fourth factor asks whether "a prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." Overton v. Bazzetta, 539 U.S. 126, 136, 123 S. Ct. 2162, 2169, 156 L. Ed. 2d 162 (2003).

[17] Defendants have not moved for dismissal of Plaintiff's equal protection claims; it appears these claims will be the only claims remaining for the Court's consideration should the undersigned's Report be adopted as the opinion of the Court. The undersigned notes that Defendants have moved for the dismissal of any of Plaintiff's retaliation claims. The Court did not sanction service of Plaintiff's Complaint based on any contention that Defendants retaliated against him, and thus, this portion of Defendants' Motion and Plaintiff's response thereto will not be addressed.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that the portion of Defendants' Motion pertaining to improper service be **DISMISSED**, as moot. It is also my **RECOMMENDATION** that the portion of Defendants' Motion based on Rule 8(a) be **DENIED**. It is also my **RECOMMENDATION** that the remaining portions of Defendants' Motion be **GRANTED**. Plaintiff's claims against FCI Jesup, the BOP, and Defendants Vandivier, Vanyur, Ruiz, Harris, Kenney, Schleder, Mauldin, Stearns, Fanucci, and Santiago should be **DISMISSED**. All of Plaintiff's claims except for his equal protection claims against Defendants Vazquez, O'Neill, Cooksey, Erlewine, Van Balaan, McFadden, Kennedy, and Holt in their individual capacities should be **DISMISSED**.

**SO REPORTED** and **RECOMMENDED**, this 2 day of July, 2008.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE